**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| NICOLOSI DISTRIBUTING, INC., <br> Plaintiff, <br> v. <br> FINISHMASTER, INC., et al., <br> Defendants. | Case No. 18-cv-03587-BLF <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND IN PART AND WITHOUT LEAVE TO AMEND IN PART** <br><br> [Re: ECF 53] |

Before the Court is Defendants FinishMaster, Inc. ("FinishMaster") and Uni-Select, Inc.'s ("Uni-Select") motion to dismiss Plaintiff Nicolosi Distributing, Inc.'s ("Nicolosi") First Amended Complaint. Mot., ECF 53. The Court held a hearing on the motion on March 7, 2019. For the reasons stated on the record and as set forth below, the motion is GRANTED WITH LEAVE TO AMEND IN PART AND WITHOUT LEAVE TO AMEND IN PART.

**I.     BACKGROUND**

In its order denying Plaintiff's motion for preliminary injunction and granting Defendants' motion to dismiss Plaintiff's Complaint, the Court detailed the factual background of this case. *See* MTD Order, ECF 49. In brief, Nicolosi is a small distributor of automotive paints and supplies in the San Francisco Bay Area. First Am. Compl. ("FAC") ¶¶ 29, 38, ECF 50. FinishMaster, a wholly owned subsidiary of Uni-Select, is a large automotive paint and supplies distributor and a direct competitor of Nicolosi. FAC ¶¶ 30–32. In this action, Nicolosi accuses Defendants of various antitrust violations resulting from FinishMaster's alleged use of exclusive dealing contracts with autobody shops (including huge up-front payments by FinishMaster and super-deep price discounts for the customer), its acquisition of smaller competitor-distributors, and its unlawful tying of products. *See generally* FAC. Nicolosi also accuses Defendants of unlawful

1 discriminatory pricing.

The Court previously granted with leave to amend Defendants' motion to dismiss Plaintiff's Complaint ("MTD Order"). The Court first details that order and then describes the new allegations in Plaintiff's FAC aimed at remedying the deficiencies the Court identified in its MTD Order.

### A. The Court's MTD Order

In its MTD Order, the Court held that Nicolosi failed to state a claim for any of its four causes of action (under Sections 1 and 2 of the Sherman Act and related state law claims) and that Nicolosi failed to allege that the Court has personal jurisdiction over Uni-Select.

The Court first analyzed Nicolosi's cause of action under Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court held that Nicolosi had, for several reasons, failed to demonstrate that FinishMaster's exclusive dealing contracts "sufficiently foreclosed competition in a substantial share of the line of commerce affected," as required to state a claim under Section 1. MTD Order at 6.

First, Nicolosi failed to plausibly allege that Bay Area A-list shops who purchase Axalta paint constitute the relevant market. Geographically, Nicolosi failed to demonstrate why the nine-county Bay Area constituted the appropriate "area of effective competition where buyers can turn for alternate sources of supply." *Id.* at 6–7 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991)). Nicolosi also had improperly defined the market based on the type of customer—namely the list level of body shops—as opposed to based on the products sold. *Id.* at 7 (citing *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)). Because Nicolosi had not distinguished A-, B-, and C-list shops in terms of their ability or desire to purchase paint, it had not properly alleged that B- and C-list shops should be excluded from the relevant market. Similarly, Nicolosi failed to allege why Axalta paint did not have economic substitutes in the market that should be included in the market definition. *Id.*

Second, Nicolosi failed to demonstrate that FinishMaster had foreclosed a substantial share of the market because it had alleged that Finishmaster had at most 33% of the market share, but even that amount was dubious given the allegation that other major distributors exist in the market

2

and potentially share in the unaccounted-for 33% of the market. *Id.*

Third, and finally, Nicolosi failed to allege that FinishMaster's activities had any anti-competitive effects in the market, such as reduced economic output or increased prices for consumers. *Id.* at 7–8.

The Court then held that these deficiencies also barred Nicolosi's Section 2 claim. Nicolosi's failure to plausibly allege an appropriate relevant market, what percentage of the market FinishMaster had captured, and any anti-competitive impacts on the market caused by FinishMaster's acts doomed its Section 2 claim. Because the Court dismissed both federal law claims, it also dismissed Nicolosi's derivative state law claims. *Id.* at 8–9.

The Court then held that Nicolosi failed to plausibly allege that the Court has personal jurisdiction over Uni-Select. Nicolosi did not rely on general jurisdiction, but instead alleged that the Court had specific jurisdiction over Uni-Select seemingly based on Uni-Select's status as FinishMaster's parent company (and thus based on FinishMaster's actions in the state) and based on Uni-Select's actions in the state through its provision of funds directly to FinishMaster. The Court rejected both sets of allegations as insufficient to allege personal jurisdiction over Uni-Select.

### B. The First Amended Complaint

In its First Amended Complaint, Nicolosi attempts to remedy the deficiencies identified in this Court's MTD Order and brings additional claims against Defendants. *See* Opp. at 1–2, ECF 54 (chart setting forth new allegations and deficient areas they attempt to address).

Nicolosi includes new allegations aimed at more clearly delineating the relevant market. As to geography, it reduces the size of the market from a nine-county Bay Area market to a four-county Bay Area market. *See, e.g.*, FAC ¶¶ 40, 106. Nicolosi supports this geographic limitation by alleging that customers generally require delivery of the paint on a same-day basis. FAC ¶ 105. As such, distributors, including FinishMaster, have a "pattern and practice" of having distribution centers "in close proximity to the auto body shop customers," leading to shops throughout each county. FAC ¶¶ 105, 107, 110. Moreover, the distributors have agreements that are granted on a "county-by-county basis," based on "long-established custom and practice of the paint

3

manufacturers." FAC ¶ 105. Nicolosi alleges that each of these facts indicates that the market should be defined as a "local county-by-county geographic market." FAC ¶ 110. Nicolosi also added allegations to support its argument that Axalta paint does not have economic substitutes in the market. Though Nicolosi admits that paint brands are "more or less interchangeable" and that a "shop can switch" the paint brand it purchases, Nicolosi alleges that "it's a hugely complicated process that is in fact rarely done." FAC ¶ 162. By contrast, Nicolosi did not add new allegations to further delineate the A-, B-, and C-list shops in terms of their willingness or ability to purchase paint. Though at times Nicolosi appears to allege that the relevant market is A- and B-list shops, elsewhere he clearly limits the market to A-list shops only. *See, e.g.*, FAC ¶¶ 66, 101.

As to FinishMaster's market share, Nicolosi alleges that FinishMaster has approximately 85% of the A-list body shop market. FAC ¶¶ 66, 101, 143. Elsewhere, Nicolosi alleges that smaller distributors "account for selling approximately two-thirds of the Bay Area Market." FAC ¶ 66.

As to the anti-competitive impacts on the market, Nicolosi alleges that FinishMaster's vertical exclusive supply and tying restraints do not enhance Interbrand competition or provide other market efficiencies because they have not improved FinishMaster's provision of services to customers. FAC ¶¶ 44–47, 112. FinishMaster's exclusive dealing contracts, which come with deep up-front payments and discounts to the customer, in tandem with FinishMaster's purchasing of small distributors in the area, has kept other smaller distributors from selling to A-list customers, and leads to a cycle of FinishMaster purchasing smaller distributors and gaining more of the market. FAC ¶¶ 66, 125. Nicolosi alleges that, at least as to one business, if FinishMaster were not allowed to use exclusive supply agreements, Nicolosi could "provide a matching or better offer" to the customer. FAC ¶ 92.

As to the Court's personal jurisdiction over Uni-Select, Nicolosi alleges that Uni-Select funds FinishMaster's actions, intending as part of its business strategy for FinishMaster to use the money to purchase smaller distributors and fund the up-front discounts to the A-list customers in California. FAC ¶¶ 8, 31, 34, 51–55, 78, 233–34, 247, 264. It also alleges that Uni-Select has substantial contacts with California because FinishMaster has activities throughout California, and

4

Uni-Select is FinishMaster's parent company. FAC ¶¶ 32, 33.

As with the original Complaint, based on these alleged actions, Nicolosi asserts the following causes of action: (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for entering into agreements in restraint of trade; (2) violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for unlawful monopolization and/or attempted monopolization; (3) violation of the Cartwright Act, California Bus. & Prof. Code §§ 16720, 16726; and (4) violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

Nicolosi also asserts the following new causes of action against Defendants, supported by new allegations: (5) price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13(f); (6) secret rebates in violation of Cal. Bus. & Prof. Code § 17045; (7) tying in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and (8) tying in violation of Cal. Bus. & Prof. Code § 16727.

To support its Robinson-Patman Act claims, Nicolosi alleges that Defendants knowingly induce and receive discriminatory price discounts from Axalta, the paint manufacturer, that are not offered to Nicolosi and other small distributors. FAC ¶¶ 202–240. First, Nicolosi alleges that Axalta gives FinishMaster a $10 million discount on its purchases, but this discount was never offered to Nicolosi. FAC ¶¶ 205–10. Defendants allegedly knew that Nicolosi never received this discount because they purchased all of the distributors large enough to make a similar $10 million order, and because the discount is offered in rush circumstances and FinishMaster knows it is the "go-to entity" in such circumstances because other smaller distributors cannot qualify for such purchases so quickly. FAC ¶¶ 208–09. Second, Nicolosi alleges that Axalta helps FinishMaster provide the up-front discounts offered to the body shops. FAC ¶¶ 223–26. Nicolosi alleges it was never offered similar discounts, FAC ¶ 229; however, it also alleges that Axalta offers it the "top-level of discounts in exactly the same way and level as are similarly available to FinishMaster" and that Axalta "has a corporate policy of giving all distributors the same discount packages." FAC ¶¶ 85–86; *see also* FAC ¶¶ 91–92 (alleging Axalta gave Nicolosi "special discounting arrangements").

These same allegations underpin Nicolosi's secret rebate claim. *See, e.g.*, FAC ¶¶ 245,

5

247 (alleging $10 million discount and up-front discount are not offered to Nicolosi on same terms). Nicolosi claims that both the $10 million discount and the up-front monies discount are kept secret. FAC ¶¶ 247–48. Nicolosi is injured by these acts because Axalta is helping its competitor and keeping it out of the market. *See, e.g.*, FAC ¶ 250–57.

Finally, Nicolosi alleges that in FinishMaster's exclusive supply agreements with body shops, it unlawfully ties the purchase of paint to the purchase of all nonpaint supplies. FAC ¶¶ 258–84. As proof, Nicolosi quotes portions of an exclusive supply agreement FinishMaster uses that says that the customer "shall purchase 100% of its paint and material requirements exclusively" from FinishMaster. FAC ¶ 272. These tying arrangements have excluded Nicolosi from selling even nonpaint products to A-list autobody shops. *See, e.g.*, FAC ¶ 267.

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

If the Court concludes that the complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose

6

of Rule 15 . . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation omitted). Nonetheless, a district court may deny leave to amend a complaint due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

After reviewing the relevant briefing and hearing argument on the record, the Court finds that Nicolosi has failed to (1) state a claim for any of its eight causes of action; and (2) to demonstrate that this Court has personal jurisdiction over Uni-Select.

The Court first revisits Nicolosi's four original causes of action, and then discusses each new cause of action in turn. The Court then discusses personal jurisdiction over Uni-Select.

### A. Claims 1–4: Sherman Act Sections 1 and 2; Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16726; and California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.

The FAC defines the relevant product and geographic markets as "a submarket of distribution of Axalta-made automotive paint lines and 3M sandpaper, tape, masking paper, and other related non-paint auto body supplies to A- List auto body shops located in either of San Mateo County, Santa Clara County, Alameda County or San Francisco County." FAC ¶ 40. Nicolosi's FAC goes some way toward remedying the deficiencies from its Complaint with respect to the relevant market, such as the geographic scope and the limitation to Axalta paint. However, Nicolosi has made no modification to the limitation to A-list customers, as opposed to A-, B-, and C- list customers. In any event, on all three points Nicolosi has not plausibly alleged that FinishMaster has foreclosed a substantial enough portion of the relevant market to be liable under the Sherman Act and related state laws.

First, Nicolosi has narrowed its alleged geographic market from the nine-county Bay Area to only four counties— San Mateo, Santa Clara, Alameda, San Francisco—alleging that the market is defined by same-day delivery requirements. *See, e.g.*, FAC ¶ 105. Although same-day

7

delivery may factually support a narrow geographic market, Nicolosi's inclusion of four neighboring counties is not plausible because there is no reason to exclude other neighboring counties, even under Plaintiff's own reasoning. For example, Plaintiff's market would exclude an autobody shop in Orinda (Contra Costa County) purchasing from a distributor in Oakland (Alameda County), where the distance between the two is only 8.6 miles. *See* Google Maps, maps.google.com (Oakland, CA to Orinda, CA). At the same time, Plaintiff's market would include an autobody shop in Livermore (Alameda County) purchasing from the same Oakland distributor, where the distance is 33 miles. *Id.* (Livermore, CA to Oakland, CA). Or more expansively, it would include an autobody shop in Gilroy (Santa Clara County) purchasing from a distributor in Livermore (Alameda County), where the distance is over 60 miles. *Id.* (Gilroy, CA to Livermore, CA). Because Nicolosi does not allege why these discrepancies make sense given the market, Nicolosi's narrow market is simply not plausible. *See Twombly*, 550 U.S. at 570. Though Nicolosi defines the geographic market in terms of its own customer base, *see* FAC ¶ 106, and alleges that distributors have stores on a "county-by-county" basis, FAC ¶ 105, these limitations do not explain the discrepancies above and thus are not enough to allege a plausible market. *See Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1175 (N.D. Cal. 2013) (holding complaint insufficiently alleged relevant geographic market in part because "Plaintiffs provide[d] no factual allegations to support drawing lines at [] county borders"); *see also Concord Assocs., L.P. v. Entm't Properties Tr.*, 817 F.3d 46, 53–55 (2d Cir. 2016) (affirming dismissal of complaint because it did not plausibly allege that geographic market for racing/gambling market should be limited to the Catskills).

Second, Nicolosi seeks to limit the relevant market to a single paint brand, Axalta. But it acknowledges that paint brands are interchangeable and offers only a conclusory reason to limit the market to a single brand. The totality of Plaintiff's allegations is set forth in FAC ¶ 162, which states: "Paint brands are more or less interchangeable; yes a shop can switch, but it's a hugely complicated process that is in fact done rarely." This allegation simply is not sufficient to make Plaintiff's claim of lack of interchangeability plausible. *See Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (holding complaint did not plausibly allege single-brand

market because "[s]ingle-brand markets are, at a minimum, extremely rare" and the complaint "fail[ed] to allege facts plausibly supporting the counterintuitive claim that Apple's operating system is so unique that is suffers *no* actual or potential competitors").

Third, Nicolosi asks this Court to find that A-list customers constitute a "customer-type submarket," and thus can be a relevant market. Opp. at 3–5. But black-letter law dictates that to define the relevant market, courts look to the geographic market and the *product* market, not the customer market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) ("The 'area of effective competition' must be determined by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country')."); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) ("The term 'relevant market' encompasses notions of geography as well as product use, quality, and description."). The product market is not defined in terms of the customer, but rather "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Oltz*, 861 F.2d at 1446; *see also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) ("[N]o more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal."). As the Ninth Circuit has made clear, "the relevant market must be a *product* market. The consumers do not define the boundaries of the market; the products or producers do." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (emphasis in original) (footnote omitted) (citing *Brown Shoe*, 370 U.S. at 325). Put another way, "[t]he relevant market . . . includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations." *Omega Envt'l., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (quoting 2A Philip E. Areeda et al., Antitrust Law ¶ 570b1 at 278 (1995)).[1]

Here, Nicolosi has not alleged why B-list and C-list shops should not be "include[d] in the full range of selling opportunities reasonably open" to Nicolosi as a rival of FinishMaster.

---

[1] Nicolosi's reliance on CACI 3414, *see* Opp. at 5, is misplaced, as that jury instruction pertains to defining the *geographic* market, not the product market.

9

Because Nicolosi fails to allege why B- and C-list shops would not desire to or cannot purchase paint from Nicolosi or why Nicolosi could not otherwise sell to these shops, it has failed to show that these consumers should be excluded from the relevant market, particularly where there is only a single product at issue with no alleged differentiation. In fact, at the hearing on the motion, Nicolosi's counsel conceded that he created the term "A-list, and that "A-list" is not an accepted industry term.

With B- and C-list shops included in the market, Nicolosi alleges at most that FinishMaster has 33% of the market, *see* FAC ¶ 66(f), but even that is not a plausible inference because Nicolosi alleges that the "smaller" distributors have two-thirds of the market share, leaving the three larger distributors (one of which is FinishMaster) and the manufacturers themselves to share the remaining 33%. FAC ¶¶ 62, 66, 96. An allegation that the defendant has less than 33% market share is not sufficient to establish a Section 1 or Section 2 claim, particularly in light of the fact that the FAC does not provide any details concerning the exclusivity agreements themselves, such as the duration of the agreements or what proportion of FinishMaster's sales are a result of such agreements. *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029–30 & n.8 (N.D. Cal. 2015) (substantial share is "40–50% of the relevant market"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (50% and 30% market shares are presumptively insufficient to establish market power for actual and attempted monopolization claims, respectively). What's more, Nicolosi still fails to plausibly allege that any of FinishMaster's actions, be it buying up smaller distributors or entering into exclusive supply agreements, has an anticompetitive effect on the market, such as reduced output or increased prices. *See Coal. for Icann Transparency Inc. v. Verisign, Inc.*, 464 F. Supp. 2d 948, 964 (N.D. Cal. 2006). Quite the contrary, Nicolosi alleges that these acts have led to price discounts for customers. *See* FAC ¶¶ 66, 88, 93.

For these reasons, Nicolosi's Sherman Act 1 and 2 claims fail. Because Nicolosi has already had the opportunity to amend as to these same deficiencies, further amendment would be futile. And because Nicolosi's state law claim under the Cartwright Act, California Bus. & Prof. Code §§ 16720, 16726, is based on the same underlying actions as its federal antitrust claims, its state law antitrust claim similarly fails. *See* Opp. at 15–17; *Eastman v. Quest Diagnostics Inc.*,

10

724 F. App'x 556, 559 n.2 (9th Cir. 2018). Likewise, to the extent Nicolosi's claim under Cal. Bus. & Prof. Code § 17200, *et seq.*, is premised on this conduct, it too fails.

For the foregoing reasons, Nicolosi's claims 1–4 are DISMISSED WITH PREJUDICE.

**B.   Claim 5: Price Discrimination, Robinson-Patman Act, 15 U.S.C. § 13(f)**

Nicolosi's next claim is for unlawful price discrimination under the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13(f) based on Axalta allegedly giving FinishMaster 10% discounts on $10 million purchases and Axalta's sharing in FinishMaster's up-front rebates to body shops. *See, e.g.*, FAC ¶¶ 85–86, 91–92, 202–240.

The RPA "prohibits sellers from discriminating on price in the sale of like goods, and thereby reducing competition, unless the price differential can be justified by savings to the seller." *Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1021 (9th Cir. 2013). The RPA contains a counterpart provision that makes it unlawful for buyers "knowingly to induce or receive a discrimination in price which is prohibited by this section." *Id.* (quoting 15 U.S.C § 13(f)). A buyer can only be liable under the RPA were "the seller is in violation of the Act as well." *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1283 (9th Cir. 1983); *accord Great Atl. & Pac. Tea Co. v. F.T.C.*, 440 U.S. 69, 77 (1979) ("[B]uyer liability under § 2(f) is dependent on seller liability under § 2(a)."). Thus, Nicolosi must allege a violation of the RPA by Axalta under Section 2(a) by pleading the following four elements: "(1) the relevant sales were made in interstate commerce; (2) the products sold were of the same grade and quality; (3) that [the seller] discriminated in price as between [the plaintiff] and another purchaser; and (4) the discrimination had a prohibited effect on competition." *High Tek USA, Inc. v. Heat & Control, Inc.*, No. 12-CV-00805 YGR, 2012 WL 2979051, at *4 (N.D. Cal. July 18, 2012) (citing *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 556 (1990)). Moreover, to be liable for the seller's price discrimination, the buyer (FinishMaster) must know "both that (1) [it] was receiving a lower price than a competitor and (2) the seller would have 'little likelihood of a defense' for offering that price." *Gorlick*, 723 F.3d at 1022. Nicolosi fails to plausibly allege several of these elements.

First, Nicolosi has not plausibly alleged that Axalta discriminated in price as between

11

Nicolosi and FinishMaster. In fact, Nicolosi's FAC alleges in several places that Nicolosi receives the same discounts as FinishMaster and that this equality is pursuant to Axalta policy. *See, e.g.*, FAC ¶¶ 85–86, 91–92. Though elsewhere Nicolosi alleges it was never offered the $10 million discount, FAC ¶¶ 217, 229, these allegations are contradicted by the FAC's other allegations. Without some additional evidence of discrimination, use of a volume discount does not plausibly imply price discrimination where there may be a legitimate reason that the seller is using such a discount. *See Automatic Canteen Co. of Am. v. FTC*, 346 U.S. 61, 71 (1953). Nicolosi also fails to allege that there was price discrimination between "two completed, substantially contemporaneous sales by the same seller." *Design & Office Concepts, Inc. v. Haworth, Inc.*, No. C-94-20905 PVT, 1995 WL 325986, at *1 (N.D. Cal. May 25, 1995). As to the 10% discount, the FAC is sparse on information regarding when and how Axalta offered the discounts to FinishMaster, and, equally importantly, what discounts it did or did not offer to Nicolosi around the same time for the same goods. As to the up-front rebates, the FAC is similarly deficient and does not clearly allege what up-front rebate help Axalta was or was not offering to Nicolosi when it was allegedly offering such help to FinishMaster. Moreover, Nicolosi has failed to demonstrate how such up-front rebates are tied to the sale of "tangible goods" to FinishMaster, considering the up-front rebates are offered to body shops (not distributors) and the rebate sharing is not otherwise allegedly related to FinishMaster's purchase of paint from Axalta. *See May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980). All of these deficiencies also make Nicolosi's allegations that it suffered injury because of such price discrimination implausible.

Second, Nicolosi has not plausibly alleged that FinishMaster knew that Axalta was engaging in any alleged price discrimination. Nicolosi's allegations of knowledge are largely conclusory. At most, Nicolosi factually alleges that FinishMaster knew that Axalta would go to it instead of other distributors to get quick $10 million revenues and that FinishMaster has bought up everyone big enough to make a similar $10 million order. FAC ¶¶ 206, 207, 209, 226. But such facts do not support a plausible inference that FinishMaster knew that Axalta was not offering such discounts to other distributors contemporaneously or would not offer such discounts to other distributors should they be able to qualify. Indeed, Nicolosi indicates it may have been able to

12

qualify, but it itself does not know if Axalta would offer it the discount on certain payment terms. FAC ¶ 208. Without more facts about the price discrimination itself, and how FinishMaster would have known it was anything other than a lawful volume discount, the Court cannot plausibly infer that FinishMaster knowingly received or induced any alleged discriminatory prices. *Cf. Gorlick*, 723 F.3d at 1021 (affirming grant of summary judgment because there was no evidence that the superior prices and discounts "resulted from anything other than the significant differences in how the two companies did business").

Because Nicolosi may be able to cure these deficiencies, and because Nicolosi has not previously had an opportunity to amend on this claim, claim 5 is DISMISSED WITH LEAVE TO AMEND.

### C. Claim 6: Secret Rebates, Cal. Bus. & Prof. Code § 17045

Nicolosi next claims that Axalta's $10 million discount and rebate-sharing constitutes a secret rebate under Cal. Bus. & Prof. Code § 17045. Section 17045 states that "[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful." A claim under Section 17045 has three elements: "(1) there must be a secret allowance of an unearned discount; (2) there must be injury to a competitor; and (3) the allowance must tend to destroy competition." *PHL Variable Ins. Co. v. Crescent Fin. & Ins. Agency, Inc.*, No. 16-CV-01307-CAS, 2018 WL 1577709, at *5 (C.D. Cal. Mar. 26, 2018) (citations and internal quotation marks omitted).

This claim fails for many of the same reasons as Nicolosi's RPA claim fails. Because Nicolosi's allegations are internally inconsistent with respect to whether it received similar discounts as FinishMaster, these facts belie the argument that the $10 million discount was secret. Nicolosi also does not adequately allege that these discounts were "unearned," including by distinguishing the discount and the up-front rebates from lawful volume discounts. And as with its RPA claim, Nicolosi does not allege that these discounts were "not extended to all purchasers

13

purchasing upon like terms and conditions" because it does not allege any contemporaneous purchase by Nicolosi for a different price. *But see Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1087 (C.D. Cal. 2017) (holding that a court can plausibly infer a tendency to destroy competition from allegations of discriminatory pricing).

Because Nicolosi may be able to cure these deficiencies, and because Nicolosi has not previously had an opportunity to amend on this claim, claim 6 is DISMISSED WITH LEAVE TO AMEND.

### D. Claims 7 & 8: Tying under Sherman Act Section 1 and Cal. Bus. & Prof. Code § 16727

Finally, Nicolosi alleges that FinishMaster has unlawfully tied the sale of paint to the sale of related automotive products. At the hearing, Nicolosi's counsel confirmed that the only evidence Nicolosi has of this tying is that FinishMaster's exclusive dealing agreement with the body shops says that the body shops will purchase all of their paint and supplies from FinishMaster. *See* FAC ¶ 272. The contract does not say that FinishMaster required the body shops to purchase the supplies in order to purchase the paint. But to state a valid tying claim, Nicolosi must plausibly allege that FinishMaster "condition[ed] the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (citation omitted). A tie only exists where "the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one." *Id.* (quoting 10 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1752b (3d ed. 2011)). "Even when a defendant sells two distinct products and its customers buy them both, we must still ask whether the two products were tied together." Areeda & Hovenkamp, Fundamentals of Antitrust Law § 17.11B at 17-132 (4th ed. 2018). The contract alone does not raise any plausible inference that the shops *had* to buy the supplies in order to also buy the paint from FinishMaster. Because Nicolosi does not, and admittedly cannot, allege that FinishMaster conditioned the body shops' purchase of paint on their purchase of supplies, Nicolosi's tying claims fail as a matter of law.

As such, Nicolosi's claims 7 and 8 are DISMISSED WITH PREJUDICE.

14

### E. Personal Jurisdiction Over Uni-Select

Nicolosi has also failed to plausibly allege that the Court has personal jurisdiction over Uni-Select. Nicolosi does not challenge the Court's ruling that Uni-Select is not subject to general jurisdiction here. MTD Order. at 9–10. As to specific jurisdiction, the FAC still asserts personal jurisdiction over Uni-Select based on its status as FinishMaster's parent company, its provision of funds to FinishMaster to fund up-front rebates to body shops, and its alleged involvement in FinishMaster's business strategy of purchasing smaller distributors and offering up-front rebates. *See, e.g.*, FAC ¶¶ 8, 31, 32, 78, 141. And Nicolosi again relies on the same evidence submitted in support of its opposition to Defendants' original motion to dismiss, including Uni-Select's annual reports, FinishMaster's press releases, excerpts from depositions of various individuals, and exemplar contracts. *See* Opp. at 23 (citing Franck Decl., Exhs. A–O, ECF 28-3). However, Nicolosi does not point to any specific information in this evidence that would bolster its personal jurisdiction argument. *See* Opp. 23–25 (citing evidence as a whole).

These three bases fail to establish personal jurisdiction. As the Court noted in its MTD Order, Uni-Select's role as a parent corporation is insufficient without allegations or evidence that Uni-Select has pervasive control over FinishMaster. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070–71 (9th Cir. 2015); *see also Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007). Likewise, Nicolosi still does not allege or provide evidence to show that provision of funds to FinishMaster by Uni-Select was "purposefully direct[ed]" at California, or FinishMaster's exclusive agreements therein. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017). Nicolosi, who bears the burden of demonstrating personal jurisdiction, does not cite to a single case in which a parent corporation's mere funding of a subsidiary corporation or aiding in corporate strategy was sufficient to establish minimum contacts with the forum state. Thus, these alleged facts and the accompanying evidence are insufficient to establish personal jurisdiction over Uni-Select. Because Nicolosi has had the opportunity to amend on this point before, further amendment would be futile.

As such, all claims against Uni-Select are DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction. Plaintiff may refile its claims against Uni-Select in a proper forum.

## IV. ORDER

For the foregoing reasons and those stated on the record at the hearing, Defendants' motion to dismiss for failure to state a claim and for lack of personal jurisdiction as to Defendant Uni-Select is GRANTED WITH LEAVE TO AMEND IN PART AND WITHOUT LEAVE TO AMEND IN PART as follows:

1. Claims 1–4 are DISMISSED WITH PREJUDICE.
2. Claims 5 and 6 are DISMISSED WITH LEAVE TO AMEND.
3. Claims 7 and 8 are DISMISSED WITH PREJUDICE.
4. All claims against Uni-Select are DISMISSED WITHOUT PREJUDICE to Uni-Select's refiling them in a proper forum.

Nicolosi's second amended complaint is due **on or before May 13, 2019**. Plaintiff may not add parties or claims without leave of the Court.

**IT IS SO ORDERED.**

Dated: April 10, 2019

BETH LABSON FREEMAN
United States District Judge